**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CONNIE MEGGS,
*Address Filed Under Seal,*
Plaintiff,

-against-

UNITED STATES OF AMERICA;
*c/o U.S. Attorney's Office, District of Columbia 950 Pennsylvania Avenue, NW Washington, DC, 20530,*

MERRICK GARLAND, individually,
*c/o Arnold & Porter 601 Massachusetts Ave, NW Washington, DC 20001,*

MATTHEW GRAVES, individually,
*c/o Winston Taylor LLP, 1901 L Street NW Washington, DC 20036*

and

JOHN DOES 1-25, individually,

Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff CONNIE MEGGS (hereinafter, "Plaintiff" or "Meggs") by and through her attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff Connie Meggs was a sixty-one-year-old grandmother who entered the Capitol on January 6, 2021, remained inside for approximately twenty minutes, assaulted no officer, damaged no property, and carried no weapon. Nevertheless, federal officials prosecuted her under an obstruction theory carrying a twenty-year maximum sentence, imprisoned her while her appeal was pending, and publicly associated her with violent extremism mostly due to the political association of her husband. The Supreme Court later rejected the legal interpretation underlying the Government's most serious charge.

3. Plaintiff was targeted, arrested, prosecuted, and punished because of her constitutionally protected expressive and associational activity as a member of the protesters who gathered on Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January 6th Defendants") and because of her husband's political association. Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants and against political associations the Government sought to penalize. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated

Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

5. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the act or omission complained of occurred in this District.

8. On or about August 29, 2025, Plaintiff transmitted three administrative Notices of Claim to the United States Department of Justice ("DOJ") setting forth the factual basis for her claims and demanding a sum certain. More than six months elapsed without final denial.

9. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

10. Plaintiff is a United States citizen and resident of Marion County, State of Florida.

11. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

12. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

13. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

14. JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## **FACTUAL ALLEGATIONS**

15. Plaintiff Connie Meggs is a mother and grandmother who accompanied her husband, Kelly Meggs, to a protest on January 6th, 2021, at the Capitol.

16. Prior to the events described herein, Plaintiff had no history of violence, no felony criminal record, and no reputation for engaging in extremist or unlawful conduct. She spent much of her adult life caring for her family, including her two adult children and three young grandchildren, and volunteering in her community.

17. On January 6th, 2021, a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

18. On that day, Plaintiff accompanied her husband, Kelly Meggs, to Washington, D.C. to attend a political rally and protest concerning the certification of the Electoral College vote. Plaintiff did not organize the rally, did not direct any participants, and did not possess any authority over any organization present that day.

19. Plaintiff was not accused of assaulting any law enforcement officer on January 6th, 2021. Plaintiff was not accused of carrying a weapon inside the United States Capitol. Plaintiff was not accused of damaging any government property. Plaintiff did not personally engage in any act of violence.

20. Plaintiff entered the Capitol after others had already breached barriers and entered the building. She remained inside for only a brief period before leaving and did not engage in any destruction of property or violence while inside.

21. The indictment against Plaintiff was unsealed on February 17, 2021. The criminal action proceeded in the United States District Court, District of Columbia, under Case No. 21-cr-28.

22. A final superseding indictment was entered on June 22, 2022. Plaintiff was charged with violating:

a. 18 U.S.C. § 1512(k): Conspiracy to Obstruct an Official Proceeding;

b. 18 U.S.C. § 1512(c)(2): Obstruction of an Official Proceeding and Aiding and Abetting;

c. 18 U.S.C. § 372: Conspiracy to Prevent an Officer from Discharging Any Duties;

d. 18 U.S.C. § 1361: Destruction of Government Property and Aiding and Abetting; and

e. 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds.

23. Despite Plaintiff's own conduct, federal authorities elected to prosecute Plaintiff alongside individuals associated with the Oath Keepers, whom the Government publicly described

as members of a paramilitary organization and participants in a conspiracy to oppose by force the lawful transfer of presidential power.

24. Although Plaintiff was not a member of or affiliated with the Oath Keepers, Plaintiff's husband, Kelly Meggs, was the leader of the Florida Oath Keepers. Upon information and belief, Plaintiff became a target of the Government's sweeping January 6th prosecutions because of her husband's political affiliations. The Government prosecuted repeatedly referred to Plaintiff with her husband in court filings, associating the two of them instead of prosecuting Plaintiff as an individual for her own actions.

25. By virtue of that joint prosecution, Plaintiff was repeatedly portrayed in public filings, court proceedings, and media reporting as part of a broader narrative concerning domestic extremism, militia activity, and political violence, with federal officials repeatedly emphasizing allegations concerning her co-defendants and associated organizations despite Plaintiff's lack of violent conduct.

26. For example, during pretrial detention proceedings, Government counsel characterized a firearms training course attended by Plaintiff as resembling a military-style offensive training program involving instruction on how to "attack and kill people" and suggested that Plaintiff's attendance at the training was evidence of dangerousness warranting continued detention.

27. Plaintiff disputed those characterizations and maintained that the training in question was a lawful firearms-safety course conducted by a legitimate Florida training facility. Defense counsel described the facility as a well-known firearms training business that regularly conducted civilian firearms-safety instruction.

28. The starkly different descriptions of the same event exemplified the broader manner in which ordinary or otherwise lawful conduct was recast as evidence of extremism when attributed to January 6 defendants.

29. Plaintiff was ultimately charged under, among other statutes, 18 U.S.C. § 1512(c)(2), a felony obstruction provision carrying a maximum sentence of twenty years' imprisonment.

30. The Government's use of that charge materially increased Plaintiff's detention exposure, sentencing exposure, and public portrayal. Through repeated public filings and courtroom advocacy, federal officials advanced a theory that transformed Plaintiff from a nonviolent protest attendee into a participant in a conspiracy directed against the United States Government. Plaintiff became publicly associated with allegations of insurrection, extremism, and political violence despite never having been accused of committing violent acts herself.

31. Plaintiff's treatment during pretrial proceedings reflected the unusual manner in which January 6th Defendants were handled. At one point Plaintiff remained in federal custody because transportation personnel refused to transport her while wearing her wedding ring, yet federal officials declined to remove the ring or otherwise resolve the issue, resulting in continued detention and additional court proceedings.

32. On March 20, 2023, Plaintiff was convicted of all charges, including 18 U.S.C. § 1512(c)(2).

33. On August 30, 2023, Plaintiff was sentenced to a total of 15 months' incarceration. Subsequent to her prison term, Plaintiff was to be on supervised release for 36 months.

34. Plaintiff appealed her conviction arguing, *inter alia*, that her conviction under 18 U.S.C. § 1512(c) was improper. Plaintiff requested a stay on her incarceration while her appeal

was pending. Plaintiff's request was denied and on October 31, 2023, while the appeal was pending Plaintiff began serving her sentence at the Federal Detention Center, Miami ("FDC Miami").

35. On June 28, 2024, the Supreme Court of the United States issued its decision in *Fischer v. United States*, substantially narrowing the scope of 18 U.S.C. § 1512(c)(2) and rejecting the expansive interpretation that federal prosecutors had relied upon in numerous January 6 prosecutions.

36. Following Fischer, Plaintiff's conviction under 18 U.S.C. § 1512(c)(2) was vacated and remanded for further proceedings.

37. Thus, after Plaintiff had already been publicly branded as an extremist, prosecuted under a theory carrying a twenty-year maximum sentence, and imprisoned while her appeal was pending, the Supreme Court rejected the legal interpretation that had served as the centerpiece of the Government's most serious charge against her.

38. Plaintiff alleges that the Government's treatment of her was not merely the result of ordinary law enforcement decision-making, but rather formed part of a broader effort to make examples of January 6th Defendants through unusually aggressive charging practices, detention positions, public messaging, and prosecutorial strategies designed to maximize punishment, deterrence, and public condemnation.

39. In addition, Plaintiff in particular was subject to these tactics not because of her own actions but because of the association of her husband, Kelly Meggs, with a political group, the Oath Keepers.

40. While at FDC Miami, Plaintiff was subjected to racist harassment and bullying that was exacerbated by mass media depictions of January 6th protestors as white supremacists.

41. Plaintiff attempted to complain about her mistreatment, but her case manager at FDC Miami discouraged Plaintiff from filing grievances. In one instance, Plaintiff's case manager, prompted by Plaintiff's complaints about being the victim of bullying and aggression, walked into the center of the unit and called all the present inmates' attention to Plaintiff's concerns. This increased the hostility directed towards Plaintiff by both inmates and facility staff.

42. While at FDC Miami, Plaintiff was subjected to excessive, unnecessary, and unwarranted solitary confinement.

43. While at FDC Miami, Plaintiff was denied religious services.

44. While at FDC Miami, Plaintiff was denied access to legal counsel.

45. While at FDC Miami, Plaintiff was denied access to Klonopin, a medication she had been taking under prescription for over fifteen years. The sudden stoppage led to insomnia, consistent nausea, and internal cramping.

**THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN**

46. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

47. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

48. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

49. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

50. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6 defendants, including Plaintiff.

51. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

52. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

53. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

## **AS AND FOR A FIRST CAUSE OF ACTION**

*Negligence – FTCA*

54. Plaintiff repeats and realleges each and every allegation contained in the prior paragraphs as though fully set forth herein.

55. This claim is asserted solely against Defendant UNITED STATES OF AMERICA pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

56. At all relevant times, employees, agents, correctional personnel, medical personnel, and administrators of the Federal Bureau of Prisons and Federal Detention Center Miami were acting within the scope of their federal employment.

57. Defendant United States owed Plaintiff a duty to exercise reasonable care for her safety, health, medical treatment, custody, and general well-being while she was incarcerated in federal custody.

58. Defendant United States further owed Plaintiff a duty to provide reasonably safe conditions of confinement, reasonably adequate medical care, reasonable protection from foreseeable harm, reasonable supervision of correctional personnel, and reasonable access to legal and religious programming consistent with applicable regulations and institutional policies.

59. During her incarceration at FDC Miami, Plaintiff reported harassment, intimidation, bullying, and hostility from other inmates and sought assistance from institutional personnel.

60. Defendant United States, through its employees and agents, failed to take reasonable measures to protect Plaintiff, reasonably investigate her complaints, or reasonably supervise personnel responsible for her safety and well-being.

61. Defendant United States further failed to exercise reasonable care in responding to Plaintiff's medical needs after learning that Plaintiff had been prescribed Klonopin for many years prior to incarceration.

62. Despite knowledge of Plaintiff's prescription history and the foreseeable risks associated with abrupt discontinuation of benzodiazepine medication, institutional medical personnel failed to adequately evaluate, monitor, treat, or mitigate Plaintiff's withdrawal symptoms.

63. Defendant United States further failed to exercise reasonable care in ensuring Plaintiff's access to religious programming, legal communications, and conditions of confinement reasonably necessary to protect her health and well-being.

64. The foregoing acts and omissions constituted negligence under the law of the jurisdiction in which the conduct occurred.

65. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, pain and suffering, emotional distress, humiliation, anxiety, loss of dignity, aggravation of preexisting medical conditions, and other compensable damages.

66. Plaintiff sustained damages in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
*Violation of the Religious Freedom Restoration Act*
*42 U.S.C. §§ 2000bb et seq.*

67. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

68. At all relevant times, Plaintiff, a practicing Christian, held sincere religious beliefs and regularly engaged in religious worship, prayer, religious study, and participation in organized religious services.

69. While incarcerated at FDC Miami, Plaintiff sought to engage in religious exercise consistent with her sincerely held religious beliefs, including but not limited to receiving communion and visits from a priest.

70. Defendant the United States, acting through employees and agents of the Federal Bureau of Prisons, denied, restricted, interfered with, or otherwise prevented Plaintiff from participating in religious services and religious exercise, including but not limited to denying Plaintiff access to communion and denying Plaintiff access to a priest.

71. The restrictions imposed upon Plaintiff substantially burdened her religious exercise within the meaning of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.

72. Upon information and belief, Defendant lacked a compelling governmental interest sufficient to justify the restrictions imposed upon Plaintiff's religious exercise.

73. In the alternative, even if a compelling governmental interest existed, Defendant failed to employ the least restrictive means of furthering that interest.

74. As a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress, spiritual injury, humiliation, loss of religious fellowship, and other damages.

**AS AND FOR A THIRD CAUSE OF ACTION**
*First Amendment Retaliation and Viewpoint Discrimination* – Bivens
*Federal Individual Defendants*

75. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

76. At all relevant times, Plaintiff engaged in activity protected by the First Amendment, including participating in political speech, attending a political demonstration, expressing political viewpoints concerning the 2020 Presidential Election.

77. Plaintiff's association with members of the Oath Keepers could not, standing alone, lawfully justify materially different investigative, charging, prosecutorial, or sentencing treatment.

78. Defendants Garland, Graves, and the John Doe Defendants (the "DOJ Defendants"), acting personally and through policies they approved, implemented, supervised, or knowingly permitted, intentionally subjected Plaintiff to materially harsher investigative,

charging, prosecutorial, and sentencing practices because of his actual or perceived political viewpoints, expressive activity, and organizational associations.

79. Upon information and belief, DOJ Defendants deliberately emphasized Plaintiff's association with members of the Oath Keepers in investigative materials, charging decisions, litigation strategy, plea negotiations, sentencing advocacy, and public messaging in order to portray Plaintiff as representative of a broader political movement rather than as an individual criminal defendant.

80. Defendants further employed the expansive interpretation of 18 U.S.C. § 1512(c)(2), together with enhanced charging practices and litigation strategies, to increase Plaintiff's detention exposure, sentencing exposure, public stigma, collateral consequences, and plea-bargaining pressure.

81. The Government's repeated public statements describing January 6 prosecutions as a principal enforcement priority, together with its emphasis upon deterrence and public example-making, demonstrate that DOJ Defendants intended not merely to prosecute alleged criminal conduct, but also to discourage similarly situated individuals from engaging in comparable political expression and association.

82. No legitimate governmental interest justified imposing materially different investigative, charging, and prosecutorial treatment upon Plaintiff because of his protected speech, expressive conduct, political viewpoints, or organizational associations.

83. DOJ Defendants' actions would deter a person of ordinary firmness from engaging in protected political speech, assembly, petitioning activity, or association out of fear of being subjected to disproportionately severe governmental investigation or prosecution.

84. As a direct and proximate result of DOJ Defendants' unconstitutional conduct, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, loss of professional opportunities, and other compensable damages.

85. Accordingly, Plaintiff is entitled to recover compensatory damages and, as against the individual Defendants, punitive damages.

**<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>**
*Intentional Infliction of Emotional Distress - FTCA*

86. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

87. Defendant the United States, by and through its employees and agents, engaged in extreme and outrageous conduct, including overcharging Plaintiff under irrelevant statutes and publicly portraying Plaintiff as a participant in organized political violence and extremist activity and publicly associating Plaintiff with violent and extremist actors.

88. Defendant the United States, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

89. The afore-described conduct was the proximate cause of Plaintiff's injuries.

90. As a result of the afore-described conduct, Plaintiff suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of permanent disability or death.

**<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>**
*Malicious Prosecution - FTCA*

91. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

92. This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

93. Acting through federal investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States caused criminal proceedings to be initiated and continued against Plaintiff under 18 U.S.C. § 1512(c)(2) in *United States v. Meggs, et al.*, No. 21-cr-28 (D.D.C.).

94. The conduct giving rise to this claim includes the investigation, presentation, and continued pursuit of the § 1512(c)(2) obstruction charge, separate and apart from any other criminal charges asserted against Plaintiff.

95. At all relevant times, federal officials knew or should have known that substantial legal questions existed regarding the scope and applicability of 18 U.S.C. § 1512(c)(2) to the conduct alleged against Plaintiff.

96. Nevertheless, federal officials continued pursuing the charge through pretrial proceedings, trial, sentencing, and appeal despite serious questions concerning whether Plaintiff's alleged conduct fell within the proper scope of the statute.

97. Federal officials acted with malice and for improper purposes, including securing enhanced detention exposure, increased sentencing exposure, and increased prosecutorial leverage beyond that otherwise available under the remaining charges.

98. Following the Supreme Court's decision in *Fischer v. United States*, Plaintiff's conviction under 18 U.S.C. § 1512(c)(2) was vacated and remanded for further proceedings.

99. As a direct and proximate result of the malicious prosecution of Plaintiff under § 1512(c)(2), Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, legal expenses, and other damages.

100. Pursuant to the FTCA, Defendant United States is liable for those injuries and damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

*Abuse of Process – FTCA*

101. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

102. This claim is asserted solely against Defendant the United States pursuant to the Federal Tort Claims Act.

103. Acting through investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States employed and continued criminal process against Plaintiff for purposes beyond the legitimate adjudication of criminal liability.

104. Upon information and belief, federal officials intentionally prosecuted Plaintiff in conjunction with individuals publicly characterized as members of a paramilitary organization and participants in a conspiracy to oppose by force the lawful transfer of presidential power, and repeatedly emphasized those associations in charging decisions, detention proceedings, court filings, sentencing advocacy, and public communications.

105. Upon information and belief, federal officials used those associations to portray Plaintiff as a participant in organized political violence notwithstanding their knowledge that Plaintiff was not accused of assaulting law enforcement officers, personally damaging government property, or carrying a weapon inside the Capitol.

106. Upon information and belief, federal officials employed and maintained criminal process not solely to adjudicate Plaintiff's individual criminal liability, but also to increase public stigmatization of Plaintiff, maximize the symbolic and deterrent value of January 6 prosecutions, enhance prosecutorial leverage through guilt-by-association, and increase Plaintiff's detention and sentencing exposure through the continued pursuit of 18 U.S.C. § 1512(c)(2).

107. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That

charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

108. As a direct and proximate result of that abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, litigation expenses, and other damages.

109. Pursuant to the FTCA, Defendant United States is liable for those injuries and damages.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
*Fifth Amendment Equal Protection* – Bivens
*Selective Enforcement, Viewpoint Discrimination, and Unequal Treatment*
*Federal Individual Defendants*

110. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

111. Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

112. Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512(c)(2), aggressive detention positions, enhanced charging decisions, and litigation strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

113. Plaintiff alleges that the DOJ Defendants intentionally subjected January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices

materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

114. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

115. No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked a rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

116. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION

*Violation of the Eighth Amendment*
*Conditions of Confinement and Deliberate Indifference*
*Against Individual Federal Defendants*

117. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

118. At all relevant times, Plaintiff was in the custody of the Federal Bureau of Prisons and housed at the Federal Detention Center Miami.

119. Defendants, acting under color of federal authority, were responsible for Plaintiff's safety, medical care, housing conditions, access to counsel, and general conditions of confinement.

120. Defendants knew or should have known that Plaintiff's status as a January 6 Defendant subjected her to heightened hostility, harassment, intimidation, and stigmatization within the institution.

121. Plaintiff repeatedly complained to institutional personnel regarding harassment, threats, intimidation, and mistreatment by other inmates.

122. Rather than reasonably responding to those complaints, institutional personnel publicly identified Plaintiff as the source of complaints, thereby increasing hostility directed toward her and exacerbating the risks to her safety.

123. Defendants were aware of facts demonstrating a substantial risk of harm to Plaintiff and consciously disregarded that risk.

124. Defendants further subjected Plaintiff to periods of unnecessary and excessive isolation and segregation that were not reasonably related to any legitimate institutional objective.

125. Defendants additionally denied or substantially interfered with Plaintiff's ability to communicate with legal counsel concerning ongoing appellate proceedings and post-conviction matters.

126. Defendants also denied or unreasonably delayed medically necessary treatment after learning that Plaintiff had been prescribed Klonopin for many years prior to incarceration.

127. Despite knowledge of Plaintiff's long-term prescription history and the known risks associated with abrupt discontinuation of benzodiazepine medication, Defendants failed to provide appropriate medical evaluation, treatment, tapering, monitoring, or alternative care.

128. As a direct result of Defendants' actions and omissions, Plaintiff experienced insomnia, nausea, abdominal pain, cramping, anxiety, emotional distress, and other physical and psychological injuries.

129. The conduct described herein constituted deliberate indifference to Plaintiff's health, safety, medical needs, and basic conditions of confinement.

130. Defendant's conduct was objectively unreasonable, arbitrary, conscience-shocking, and inconsistent with contemporary standards of decency.

131. As a direct and proximate result of Defendant's unconstitutional conduct, Plaintiff suffered loss of liberty, physical injury, emotional distress, humiliation, pain and suffering, and other compensable damages.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: October 2, 2026

Respectfully submitted,

/s/Alexander Lonstein
Alexander Lonstein
RAISER, KENNIFF & LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law